**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **JOHNNY SWANK** | **CIVIL ACTION** |
| **VERSUS** | **NO. 11-2677-DEK** |
| **WARDEN ROBERT C. TANNER** | |

**ORDER AND REASONS**

Plaintiff, Johnny Swank, a state prisoner, filed this *pro se* and *in forma pauperis* complaint against Warden Robert C. Tanner. In the complaint, plaintiff stated his claim as follows:

> On February 15, 2011, I Johnny Swank 438338 and other members of the Wiccan Religious Group was summoned to appear before Warden Bickman and Warden Cook for the purpose of confiscation of personal use items such as, stones, feathers, prayers clothes, wand, small container, medallion, Tarot or Rune Cards. We believe these are essentially an important part of our daily prayers.
>
> As a group we were also informed that the decision didn't come from any known Wiccan Organisation in the United States, the received their information from Canda [sic].[1]

As a result of an earlier motion filed by Warden Tanner, plaintiff's claims have since been further clarified. Specifically, the Court has determined that plaintiff is asserting two claims. First, he is asserting a claim that his rights under the First Amendment were violated by the confiscation of religious items he used in the exercise of his Wiccan faith. Second, he is asserting a claim that his rights under the Equal Protection Clause were violated because Wiccans are subjected to

---

[1] Rec. Doc. 1, p. 3. "Warden Bickman" is actually Deputy Warden Keith Bickham. See Rec. Doc. 25-4.

discrimination and treated differently than adherents of other religions and denominations, specifically including Protestants, Catholics, and Muslims.[2]

Warden Tanner has now filed a motion for summary judgment pursuant to Fed.R.Civ.P. 56.[3] Plaintiff has opposed that motion.[4] The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge.[5]

## I. Summary Judgment Standards

The principal purpose of Rule 56 is to isolate and dispose of factually unsupported claims. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). In reviewing a motion for summary judgment, the Court may grant the motion when no genuine issue of material fact exists and the mover is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). There is no "genuine issue" when the record taken as a whole could not lead a rational trier of fact to find for the nonmovant. Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

"Procedurally, the party moving for summary judgment bears the initial burden of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." Taita Chemical Co., Ltd. v. Westlake Styrene Corp., 246 F.3d 377, 385 (5th Cir. 2001) (quotation marks and brackets omitted).

---

[2] Rec. Docs. 11 and 12.

[3] Rec. Doc. 25.

[4] Rec. Doc. 27. Plaintiff styled his filing as a "Motion for Summary Judgment"; however, that filing appears to be an opposition rather than a cross-motion for summary judgment. Nevertheless, regardless of how that filing is categorized, the result here is the same.

[5] Rec. Doc. 17.

The party opposing summary judgment must then "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex Corp., 477 U.S. at 324 (quoting Fed.R.Civ.P. 56); see also Provident Life and Accident Ins. Co. v. Goel, 274 F.3d 984, 991 (5th Cir. 2001). The Court has no duty to search the record for evidence to support a party's opposition to summary judgment; rather, "[t]he party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which the evidence supports his or her claim." Ragas v. Tennessee Gas Pipeline Co., 136 F.3d 455, 458 (5th Cir. 1998). Conclusory statements, speculation, and unsubstantiated assertions are not competent summary judgment evidence and will not suffice to defeat a properly supported motion for summary judgment. Id.; Douglass v. United Servs. Auto Ass'n, 79 F.3d 1415, 1429 (5th Cir. 1996).

## II. Facts

The instant case primarily concerns the limitations on religious items Wiccan prisoners are allowed to keep with their personal property. There is little, if any, dispute as to the underlying facts.

The evidence submitted in support of the motion for summary judgment shows that a Wiccan group was formed at the B.B. "Sixty" Rayburn Correctional Center in approximately 2008. Thereafter, Assistant Warden Wayne Cook, in consultation with Velvet Reith, a Wiccan High Priestess, developed a list of religious items approved for use by Wiccan prisoners. However, over time, prison officials became concerned that some of the items on that list posed security hazards. Based on those concerns, the suspect items were confiscated and stored for use during communal

services only as an interim measure while the policies regarding personal possession of religious items was revised.

At that point, Cook attempted to again contact Reith to determine which items on the list were actually necessary for Wiccans to exercise their religion. Reith failed to respond to Cook's telephone calls or emails.

Cook also met with Wiccan inmates at the prison to have them identify which religious items were truly needed and explain to him why those items were necessary. The prisoners identified the following items as being "important to their religious practices": the Book of Shadows; a pentagram medallion; a prayer cloth; stones; feathers; a small container holding a salt/dirt mixture; a wooden stick; a small box to store the religious objects; and Tarot or Rune Cards.

In addition, Cook contacted a Wiccan High Priestess designated by the Canadian Department of Corrections as being learned in the practice of Wicca in institutional settings. According to that High Priestess, only the Book of Shadows is in fact necessary for Wiccan devotions; however, she also "noted that each individual person or group practices Wicca a little differently."

With such input, uniform policies were then promulgated to be used throughout the state prison system to regulate the possession of religious items by adherents of various religions, including but not limited to Wiccans. The promulgation procedures took several months and the new polices went into effect in September of 2011. Under the revised policies, the following items were approved for use by Wiccan prisoners: the Book of Shadows; a pentagram medallion; a prayer or altar cloth; stones; feathers; a small container with a salt/dirt mixture; a wooden stick; a small box for storing the religious objects; and Tarot or Rune cards. Of those items, only the following three

could be kept with an inmate's personal property: the Book of Shadows; a medallion; and a prayer cloth. The remaining items must kept secured and are available for use by prisoners only during communal services.

Against this factual backdrop, plaintiff claims that he had the following items confiscated in January of 2011: stones; feathers; prayer cloths; a wand; a small container; a medallion; and Tarot or Rune Cards. Warden Tanner does not dispute either that at least some of those items were in fact confiscated from plaintiff[6] or that such items must now be kept secured and are available for use only during communal services.

III. Plaintiff's Claims

A. First Amendment Claim

Plaintiff's first claim is that he has been denied the right to exercise his religion, Wicca. Specifically, he claims that the prison policies at issue are unconstitutional because they do not allow him to keep the confiscated items with his personal property for use in connection with his daily prayers.

In Turner v. Safley, 482 U.S. 78 (1987), the United States Supreme Court established a multi-prong analysis to be used in analyzing such claims. Summarizing that analysis, the United States Fifth Circuit Court of Appeals has explained:

> Inmates retain their First Amendment right to exercise religion; however, this right is subject to reasonable restrictions and limitations necessitated by penological

[6] Warden Tanner notes that in plaintiff's administrative grievance he did not mention confiscation of Tarot cards or a pentagram medallion; therefore, Tanner appears to dispute whether those items were among the confiscated property. That dispute is of no consequence for the purposes of this decision.

> goals. A restriction impinging on an inmate's constitutional rights must be upheld if it is reasonably related to legitimate penological interests. To evaluate the reasonableness of a prison restriction, this court considers (1) whether the regulation or action has a logical connection to the legitimate governmental interests invoked to justify it; (2) whether the inmate has an available alternative means of exercising the rights; (3) the impact of accommodation on other inmates, guards, and prison resources; and (4) the presence or absence of ready alternatives that fully accommodate the prisoner's rights at *de minimis* cost to valid penological interests. A court must determine whether the government objective underlying the regulation at issue is legitimate and neutral, and that the regulations are rationally related to that objective. Due regard also must be given to the decisions of prison officials, because prison administrators, and not the courts, are to make the difficult judgments concerning institutional operations.

McFaul v. Valenzuela, 684 F.3d 564, 571-72 (5th Cir. 2012) (citation, footnotes, quotation marks, brackets, and ellipsis omitted). The Fifth Circuit has also noted:

> Later cases applying the four Turner factors have noted that rationality is the controlling factor, and a court need not weigh each factor equally. Where a regulation restricts First Amendment rights in a neutral fashion, it is more likely to withstand judicial scrutiny. Furthermore, where a regulation restricts one aspect of an offender's belief system but the offender retains the ability to participate in other religious observances of his faith, courts often reach the conclusion that the restriction at issue was reasonable.

McAlister v. Livingston, 348 Fed. App'x 923, 931-32 (5th Cir. 2009) (citations, quotation marks, brackets, and ellipses omitted). Moreover, where, as here, "a state penal system is involved, federal courts have ... additional reason to accord deference to the appropriate prison authorities." Turner, 482 U.S. at 85; see also McAlister, 348 Fed. App'x at 931 ("Judicial restraint is even more appropriate where a federal court reviews the policies of a state penal system.").

As to the first factor of the Turner analysis, i.e. whether the regulation or action has a logical connection to the legitimate governmental interests invoked to justify it, Warden Tanner opines that the policies requiring that certain religious items be kept secured and available for only communal

services is based on concerns of safety and security. Specifically, the policies are based on a determination that the following items used by Wiccans pose the noted threats:

1. Stones: can be used as projectiles to cause injury and to damage and disable locks
2. Feathers: can be used as fletching for darts to be used a weapon; large feathers can also be used as a "shank"
3. Salt/Dirt mixture and container: the mixture can be used as a weapon by throwing it in someone's face; the container can be used to hide contraband
4. Wooden stick: can be used as a weapon
5. Tarot/Rune Cards: can be used for gambling, trafficking, and trading, and for secretly passing information

Maintaining prison safety and security is clearly a legitimate governmental interest. See, e.g., McFaul, 684 F.3d at 572-73; Green v. Polunsky, 229 F.3d 486, 490 (5th Cir. 2000); see also Schmidt v. Johnson, 75 Fed. App'x 218, 220 (5th Cir. 2003) ("A prisoner's First Amendment rights may be circumscribed when legitimate penological objectives such as institutional order and security outweigh the concerns associated with preservation of the inmate's right."). Moreover, there is no evidence whatsoever that, as required by law, the policies have failed to operate in a neutral fashion, without regard to the content of the religious expression.[7] See Turner, 482 U.S. at 90. Further, this

---

[7] On the contrary, the policies restrict possession of religious items by adherents of *all* faiths, including Christians, Muslims, Jews, Native Americans, etc. Further, the restrictions are similar regardless of the religion at issue, with personal religious items generally being restricted to a holy book, religious literature, a prayer mat or rug, a cap/scarf/skullcap, prayer beads, and a religious medallion. Rec. Doc. 25-6.

Court has no hesitation in finding that proffered safety and security concerns regarding these items are legitimate rather than pretextual. Lastly, the Court likewise has no hesitation in finding that the policies' requirement that the items be securely stored and made available to prisoners for their use only at specified times during communal services is rational and bears a logical connection to the preservation of the legitimate government interests noted. See McAlister, 348 Fed. App'x at 932 n.5; Mayfield v. Texas Department of Criminal Justice, 529 F.3d 599, 610-11 (5th Cir. 2008); see also Schmidt, 75 Fed. App'x at 220 ("We accord great deference to prison administrators' judgments regarding jail security." (quotation marks omitted)). Therefore, the first factor of the Turner analysis favors Warden Tanner's position.

Turning to the second factor, "[t]o determine whether there is an alternative way for the prisoner to exercise his right to practice his religion, courts consider whether the regulation entirely stifles the prisoners religious expression." McFaul, 684 F.3d at 574. Plaintiff does not argue that the policies prevent him for practicing his religion entirely, and clearly they do not. There is no dispute that plaintiff could attend the prison's communal Wiccan services, at which all of the items are available for his use. Rather, plaintiff's complaint is that the policies interfere with his ability to perform his daily prayers. However, such a partial infringement is generally insufficient to render a policy unconstitutional, because "[w]here an inmate is unable to engage in a *particular* religious practice, courts consider whether under these regulations prisoners retain the ability to participate in *other* religious ceremonies." McFaul, 684 F.3d at 574 (emphasis added); see also Freeman v. Texas Department of Criminal Justice, 369 F.3d 854, 861 (5th Cir. 2004) ("The pertinent question is not whether the inmates have been denied specific religious accommodations, but whether, more

broadly, the prison affords the inmates opportunities to exercise their faith."). In that plaintiff is clearly able to engage in some observances necessary to his religion, his purported inability to participate in other rituals simply does not show an absence of alternatives as required to render the policies unconstitutional. McFaul, 684 F.3d at 574-75. Therefore, the second factor of the analysis likewise favors Warden Tanner's position.

The same is obviously true of the third factor, i.e. the impact of accommodation on other inmates, guards, and prison resources. For the reasons noted by Warden Tanner, it is evident that restricted items could easily be used to injure other inmates and guards, to disable locks, to hide contraband, to gamble, and to pass secret messages. Therefore, permitting prisoners to keep such items in their possession at all times would require extra effort on the part of staff to maintain safety and security, and the resulting increased costs which would necessarily be incurred obviously weigh in favor of Warden Tanner's position. McFaul, 684 at 575.

The fourth factor to be considered is whether there are ready alternatives which would fully accommodate the prisoner's rights at *de minimis* cost to valid penological interests. This final factor does *not* require prison officials to "set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." Turner, 482 U.S. at 90-91. In the instant case, no such alternatives are apparent to the Court or have been identified by plaintiff. Without such alternatives, this factor likewise weighs in Warden Tanner's favor.

In summary, the Court finds that all four of the applicable factors weigh in favor of Warden Tanner's position. Accordingly, even if plaintiff's beliefs are sincere,[8] the challenged policies are nevertheless constitutional, and plaintiff's First Amendment claim must therefore be dismissed.

B. Equal Protection

Plaintiff also claims that his rights under the Equal Protection Clause have been violated because Wiccans are subjected to discrimination and treated differently than adherents of other religions and denominations, specifically including Protestants, Catholics, and Muslims.

To properly state an equal protection claim, a plaintiff's allegations must have two prongs: (1) "that he received treatment different from that received by similarly situated individuals" and (2) "that the unequal treatment stemmed from a discriminatory intent." Taylor v. Johnson, 257 F.3d 470, 473 (5th Cir. 2001). As to the second prong, "[d]iscriminatory purpose in an equal protection context implies that the decisionmaker selected a particular course of action at least in part because of ... the adverse impact it would have on an identifiable group." United States v. Galloway, 951 F.2d 64, 65 (5th Cir. 1992); see also Taylor, 257 F.3d at 473.

---

[8] It must be noted that only "sincerely held religious beliefs and practices" are protected by the First Amendment. McAlister, 348 Fed. App'x at 931. Warden Tanner disputes whether plaintiff sincerely believes that the items at issue are necessary for daily prayers. Tanner posits that because the items are still available for use during communal services and because plaintiff has voluntarily declined to attend such services since April of 2011, his nonattendance of *communal* services casts doubt on the sincerity of his purported belief that such items are necessary for *private* devotional purposes. That, however, does not necessarily follow. Nevertheless, plaintiff, who ultimately bears the burden of proof in this proceeding, offers no evidence tending to establish the sincerity of his purported beliefs on this issue. In any event, even if the Court assumes for the purposes of this decision that plaintiff's beliefs are sincere, the policies in question are constitutional for the reasons explained.

When confronting a similar Equal Protection claim alleging disparate treatment of faiths, the United States Fifth Circuit Court of Appeal explained:

> [T]he Fourteenth Amendment does not demand "that every religious sect or group within a prison – however few in numbers – must have identical facilities or personnel." Cruz v. Beto, 405 U.S. 319, 322, 92 S.Ct. 1079, 1082 n.2, 31 L.Ed.2d 263 (1972). Instead, prison administrators must provide inmates with "reasonable opportunities ... to exercise the religious freedoms guaranteed by the First and Fourteenth Amendments." Id. Turner applies with corresponding force to equal protection claims. Williams v. Morton, 343 F.3d 212, 221 (3d Cir. 2003).

Freeman, 369 F.3d at 862-63. Therefore, where, as here, the prison policies in question satisfy Turner's requirements, little or no evidence has been offered showing that similarly situated faiths are afforded superior treatment, and no evidence establishes that the policies were the product of purposeful discrimination, the Equal Protection claim fails. Id. at 863.

Accordingly, for all of the foregoing reasons,

**IT IS ORDERED** that defendant's motion for summary judgment, Rec. Doc. 25, is **GRANTED** and that plaintiff's claims are **DISMISSED WITH PREJUDICE**.

New Orleans, Louisiana, this fourth day of September, 2012.

**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**